**Opinion issued June 21, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-15-00758-CV**

**NO. 01-15-01102-CV**

———————————

**IN RE ADVANCED POWDER SOLUTIONS, INC., Relator**

**Original Proceedings on Petitions for Writs of Mandamus**

# O P I N I O N

Relator, Advanced Powder Solutions, Inc., filed two petitions for writs of mandamus, both arising from a suit brought by real party in interest, Tremaine Hewitt, an APS employee who suffered injuries while working at APS.[1] In the first petition, cause number 01-15-00758-CV, APS challenges the trial court's

---

[1] The underlying case is *Tremaine Hewitt v. Advanced Powder Solutions, Inc.*, cause number 2014-16020, pending in the 125th District Court of Harris County, Texas, the Hon. Kyle Carter presiding.

denial of a motion to compel Hewitt to submit to physical examinations. In the second petition, cause number 01-15-01102-CV, APS challenges the trial court's order imposing sanctions for spoliation of evidence, in which the trial court both granted a spoliation instruction and ordered APS's answer stricken.

We conditionally grant the first petition with respect to APS's request for a medical examination and the second petition with respect to the trial court's decision to strike APS's pleadings. We otherwise deny each petition.

## Background

### A. Hewitt Suffers Injuries

APS operates a chemical plant near Houston, Texas. On August 26, 2013, Tremaine Hewitt was employed by APS at the plant. Hewitt was working on a ladder near a reactor, pouring magnesium powder into the reactor from a bucket. While he was doing so, another APS employee, Donnie Guzman, opened and closed a valve on the opposite side of the reactor, which Baker later testified was "[n]ot something [Guzman] should have been doing." An explosion and fire occurred, which Hewitt attributes to Guzman's actions and which APS alleges was due to Hewitt's use of a bucket too large for the task. Hewitt fell off of the ladder and, either before or after his fall, was set on fire.

Hewitt suffered burns to much of his body, as well as orthopedic injuries. Dean Baker, general manager of APS, later testified, "When I saw [Hewitt's]

injuries, I knew it was an emergency situation." Baker further testified that, immediately after the accident, he observed burns on Hewitt's right arm, legs, and face; Hewitt's skin began to come off on its own before he had left APS's facility. Baker drove Hewitt to a hospital, and Hewitt was later transferred by "life flight" to a burn unit at Memorial Hermann Hospital in Houston. Hewitt ultimately spent approximately one month recovering in a hospital burn unit, received skin grafts, and underwent surgery. Hewitt alleges that he has since undergone multiple surgeries related to his burn injuries and orthopedic injuries that he sustained as a result of the fall.

## B. APS Security Cameras Record the Incident

At the time of the incident, APS had a 16-camera, Q-See QT 426 security camera system.[2] APS's camera system recorded video of the incident. According to Baker, he and two other APS employees viewed the video later that day. While Hewitt was in the hospital, he asked to see the video. Baker visited him and showed him the video captured by the security camera system on two different occasions and also showed the video to Hewitt's girlfriend. Baker did this by streaming the video over the internet to a tablet device, not by saving it to the device.

---

[2] APS purchased this system in January 2013 and installed it in April 2013, five months before Hewitt was injured. Hewitt himself installed some of the cameras. Until that time, APS had not had a security camera system.

Baker never attempted to save any portion of the video related to the incident, nor did he ask anyone to help him do so. During his deposition, however, he was asked, "Did you ever think maybe I should preserve that tape?," to which he answered, "Yes." He also testified that he had saved videos of other injuries that have occurred at APS, specifically, "[t]hose that [one] actually could see something" or when there were "conflicts" between different accounts of the incident, including video showing an injury to another APS employee in 2015. By contrast, APS did not keep video of another incident in August 2015 because "[p]eople wrote up the incident that matched what happened," and the injured employee "admitted that he wasn't wearing the right stuff . . . . [and] was doing the wrong thing." Baker made the decisions for APS regarding whether to keep these videos.

Baker testified that, before the security camera system recorded over the video, he used the video to determine "exactly what happened that day." In August 2015, nearly two years after the accident, Baker used this knowledge to plan, conduct, and film an "experiment . . . to recreate the accident" by "repeating the steps that happened that day," specifically by testing what happened if someone was "loading powder [into the reactor involved in the incident] . . . the way we normally do it and someone had done what Donnie Guzman had done" in opening a valve. He also ran at least two other "experiments" "to determine what happened

4

or why it happened" after consulting with expert witnesses hired by APS in connection with Hewitt's suit, who had not seen the video.

## C.   Hewitt Files Suit

Hewitt began contemplating legal action shortly after the incident.  Baker later testified in a deposition about his conversations with Hewitt:

> Q.   Was he talking about maybe hiring a lawyer?
> A.   At some point he was, yes.
> Q.   It was early on, wasn't it?
> A.   I don't know the exact date; but, yes, it was fairly early on.
> Q.   He was still in the hospital, right?
> A.   Yes, he was.
> Q.   Still around that same time where you showed him that video, right?
> A.   I showed him the video within the first week, I believe, of his stay at the hospital.

Baker further testified by affidavit that, in March 2014, Hewitt "told [Baker] it was not personal, but that he found an attorney that would get him $10,000,000+ and he would own APS or a portion of it."  Baker "told [Hewitt] to have his attorney contact APS'[s] attorney, Charles Sturm, about his damages."[3]

On March 24, 2014, Hewitt filed the underlying suit against APS.  Hewitt alleges that he "was working at [APS's] facility in front of a reactor when a co-worker began manipulating valves on the reactor."  He further alleges that this

---

[3]   Sturm is, in fact, APS's counsel in this litigation.  We note that APS also engaged counsel within a few months after the accident.  In September 2013, the federal Occupational Safety and Health Administration ("OSHA") sent an inspector to the APS facility where Hewitt was injured; this prompted Baker to contact counsel.

"caused a blast and caused [him] to fall off the ladder and into a fire," as a result of which he suffered "severe burns and orthopedic injuries." He contends that APS's negligence and gross negligence caused his injuries and asserts claims for actual damages, consequential damages, punitive damages, and interest.[4]

Hewitt was unable to serve APS, despite attempting to do so. On June 14, 2014, the trial court granted Hewitt's motion for substituted service, and on June 26, 2014, Hewitt served APS with the lawsuit.

## D.   APS Moves to Compel a Physical Examination of Hewitt

In May 2015, APS filed a Motion for Plaintiff to Submit to Physical Examination. APS pointed to Hewitt's identification of Angel M. Roman, M.D., and Kenneth McCoin, Ph.D., as expert witnesses, and contended that the trial court should require Hewitt to submit to physical examinations in order to permit APS to rebut the testimony of these witnesses.

Dr. Roman, a physician, is expected to testify regarding Hewitt's physical condition, based upon both Hewitt's medical records and Dr. Roman's own examination of Hewitt. He also intends to offer opinions regarding the causation

---

[4]    Hewitt subsequently amended his petition, on the same day that he filed his response to the petition for writ of mandamus in cause 01-15-00758-CV, to name Dean Baker and his wife, Martha Baker, as defendants. Hewitt's amended petition asserts substantively the same claims against APS as his original petition. The most significant differences from the original petition are the addition of the Bakers as defendants and the assertion of various theories under which Hewitt seeks to hold them liable for acts of APS. Neither of the Bakers is a party to these mandamus proceedings.

of Hewitt's injuries and "the reasonableness and necessity of medical treatment [Hewitt] has received . . . [or] will require in the future."

Dr. McCoin, by contrast, is an economist who calculated Hewitt's expected lifetime earnings both in light of his injuries and in a hypothetical scenario in which he had not been injured. Dr. McCoin's calculations explicitly depended on an assumption that "Hewitt will obtain alternative employment on January 1, 2015, at $18,000 per year ($8.65/hour) and incur annual work expenses of $3,600." He also assumed that Hewitt "has lost, as a comparative, 20 percent of his contribution to household services," which he valued at $8.75 per hour, terminating at age 70. Dr. McCoin submitted a report setting out his methodology and conclusions, which does not include any assessments of Hewitt's physical condition, capacity to work, or ability.

APS argued that it was entitled to (1) a medical examination of Hewitt by APS's retained plastic surgeon, Ramsey J. Choucair, M.D., and (2) a "functional capacity evaluation and impairment rating in order to determine [Hewitt's] ability to return to work," to be performed by Ergonomic Rehabilitation of Houston ("ErgoRehab"), to which Hewitt had been referred by Dr. Todd Huzar of UT Health Science Center. With respect to the ErgoRehab functional capacity evaluation, APS argued that it was "simply a request [that Hewitt] submit to an exam by a healthcare provider as ordered by his treating doctor." APS stipulated

that it was "willing to have the examinations take place simultaneously in [an] effort to minimize the inconvenience to [Hewitt]."

Hewitt filed a response, arguing that (1) APS failed to show "good cause" for physical examinations as required by Texas Rule of Civil Procedure 204.1; (2) APS did not demonstrate an entitlement to the examinations under Texas case law; (3) APS failed to pursue less intrusive means of obtaining the desired information, including depositions of Hewitt's experts; and (4) in making its request for a functional capacity examination, APS essentially sought to compel Hewitt to undergo medical treatment in violation of his rights to privacy and to make decisions regarding his own health care. Hewitt also argued that Dr. Huzar, who had originally referred Hewitt to ErgoRehab, was no longer treating Hewitt. APS filed a reply challenging Hewitt's arguments.

In July 2015, without conducting a hearing, the trial court denied the motion. On September 3, 2015, APS initiated the first of its mandamus proceedings, cause number 01-15-00758-CV. At the time, the matter was set for trial in October 2015. Therefore, on the same day that it filed its petition for mandamus relief, APS also requested temporary relief in the form of a stay of the trial. The following day, this Court stayed the trial. We also requested a response to the petition from Hewitt, which he provided.

8

**E.  Hewitt Moves for Sanctions**

Meanwhile, the parties had engaged in discovery.  Hewitt's counsel wrote to APS on July 1, 2014, five days after serving APS with Hewitt's original petition, requesting that APS preserve various evidence related to Hewitt's injuries.  In relevant part, that letter asked that APS preserve

> (5)     any pictures or video relating to the incident;
>
> . . . .
>
> (7)     all iPhone or iPad images or messages, including text messages since the incident; and
>
> (8)     all computers, servers, or systems.
>
> As for electronic data, any routine purge of emails or other data should be disabled until all documents are gathered and turned over.

Baker, however, was not able to locate a copy of the video.  In January 2014, approximately five months after Hewitt was injured, APS replaced the camera system in use at the time of the accident with a Q-See QT 1624 system that allows for the use of additional cameras.  He explained in an affidavit,

> In April of 2014, I attempted to view the video of the accident.  I could not view the video as the recording settings had been changed and the video had been written over.  I contacted a representative of ASAR IT Solutions (Syed) and told him that the system had written over the video of the accident.  I gave the ASAR IT representative the older system and asked [him] to take it with him to see if the data could be retrieved and he later advised it could not.

On September 18, 2015, Hewitt filed a motion in the trial court in which he asked the trial court to sanction APS by striking its pleadings and ordering a

spoliation instruction. APS filed a response, arguing that the destruction of the recording was inadvertent and that APS had no duty to preserve it until Hewitt's counsel sent the July 1, 2014, letter regarding preservation of evidence.

Without conducting a hearing, the trial court granted the motion for sanctions, imposing sanctions by striking APS's pleadings and in the form of a spoliation instruction to be given to the jury at trial. The trial court did not specify its reasoning for either sanction. APS filed a motion for reconsideration, to which Hewitt filed an opposing response. The trial court conducted a hearing, at which it requested letter briefs from each party regarding APS's diligence in preserving evidence. After each party filed its letter brief, the trial court denied the motion for reconsideration, again without providing any reasoning.

On December 28, 2015, APS filed its second petition for writ of mandamus, initiating cause number 01-15-01102-CV. We requested a response from Hewitt. Hewitt filed his response, arguing that the sanctions were appropriate, and APS filed a reply.

**Mandamus Standard of Review**

Mandamus is an extraordinary remedy, available only when the relator can show both that (1) the trial court clearly abused its discretion; and (2) there is no adequate remedy by way of appeal. *In re Ford Motor Co.*, 165 S.W.3d 315, 317 (Tex. 2005) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.

1992) (orig. proceeding). A clear abuse of discretion occurs when a trial court "reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Walker*, 827 S.W.2d at 839 (internal quotation marks and citation omitted). A trial court has no discretion in determining what the law is or in applying the law to the particular facts. *Id.* at 840. A clear failure by the trial court to analyze or apply the law correctly constitutes an abuse of discretion. *Id.*

In determining whether an appeal is an adequate remedy, we consider whether the benefits outweigh the detriments of mandamus review. *In re BP Prods. N. Am., Inc.*, 244 S.W.3d 840, 845 (Tex. 2008) (orig. proceeding); *Ford Motor Co.*, 165 S.W.3d at 317. A party establishes that no adequate appellate remedy exists by showing it is in real danger of losing its substantial rights. *Perry v. Del Rio*, 66 S.W.3d 239, 257 (Tex. 2001) (orig. proceeding); *Walker*, 827 S.W.2d at 842.

## Motion to Compel Medical Examinations

We turn first to the challenge of the trial court's order denying APS's motion to compel medical examinations of Hewitt.

### A. Applicable Law

Texas Rule of Civil Procedure 204.1(a) provides, in relevant part, "A party may . . . move for an order compelling another party to: . . . submit to a physical . . . examination by a qualified physician . . . ." TEX. R. CIV.

11

P. 204.1(a)(1). The trial court "may issue an order for [physical] examination [of a party] only for good cause shown and only . . . when the . . . physical condition . . . of a party . . . is in controversy." TEX. R. CIV. P. 204.1(c)(1).

"Rule 204.1(c) of the Texas Rules of Civil Procedure does not grant an automatic right to obtain a physical or mental examination." *In re Ten Hagen Excavating, Inc.*, 435 S.W.3d 859, 866 (Tex. App.—Dallas 2014, orig. proceeding). Rather, "there must be greater showing of need to obtain a physical or mental examination than to obtain other sorts of discovery." *Id.* (citing *Schlagenhauf v. Holder*, 379 U.S. 104, 118, 85 S. Ct. 234, 243 (1964) (analyzing analogous federal rules)). "Rule 204.1, by its express language, places an affirmative burden on the movant to meet a two pronged test: (1) the movant must show that the party's condition is 'in controversy'; and (2) the movant must demonstrate that there is 'good cause' for such an examination." *Id.*; *see also Coates v. Whittington*, 758 S.W.2d 749, 751 (Tex. 1988) (orig. proceeding) (identifying same test with respect to mental examinations under predecessor rule to 204.1). "A plaintiff in a negligence action who asserts mental or physical injury . . . places that mental or physical injury in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury." *Schlagenhauf*, 379 U.S. at 119, 85 S. Ct. at 243.

The Supreme Court of Texas has identified three elements of a showing of "good cause" for purposes of a compelled examination of an individual:

> The requirement of good cause for a compulsory . . . examination may be satisfied only when the movant satisfies three elements. First, that an examination is relevant to issues that are genuinely in controversy in the case. It must be shown that the requested examination will produce, or is likely to lead to, evidence of relevance to the case. Second, a party must show a reasonable nexus between the condition in controversy and the examination sought. . . . Finally, a movant must demonstrate that it is not possible to obtain the desired information through means that are less intrusive than a compelled examination. The movant must demonstrate that the information sought is required to obtain a fair trial and therefore necessitates intrusion upon the privacy of the person he seeks to have examined.

*Coates*, 758 S.W.2d at 753 (internal citations omitted). As the court further explained, a plaintiff's "privacy interests require, at minimum, that [the defendant] exhaust less intrusive means of discovery before seeking a compulsory . . . examination. If, however, a plaintiff intends to use expert medical testimony to prove his or her alleged . . . condition, that condition is placed in controversy and the defendant would have good cause for an examination under Rule 167a," the predecessor rule to Rule 204.1. *Id.*

**B.    Analysis**

In order to analyze the trial court's order, the first question we must address is the number and nature of examinations that APS sought to compel.

APS filed a single motion, captioned "Defendant's Motion for Plaintiff to Submit to Physical Examination," in which APS stated that it was "seeking to have

[Hewitt] undergo *a physical examination* by" a doctor and a rehabilitation center. (Emphasis added.) And in the conclusion of its motion, APS asked that the trial court "compel Plaintiff to attend *a physical examination* by Ramsey J. Choucair, M.D. and Ergonomic Rehabilitation of Houston at a time and place agreed upon by the parties." (Emphasis added.) It also, however, stated that it was "willing to have the *examinations* take place simultaneously" and that "the *examinations* sought by [APS] *are* not intrusive, invasive, or unnecessarily physically uncomfortable." (Emphasis added.) We note that Hewitt's response referred to the requested relief as "examinations," in the plural, at least twice. APS's reply in support of its motion continued to refer to the requested relief using a mix of singular and plural forms of the word "examination."

The record is clear that APS sought two different types of examinations, the parties' inconsistent use of plurals notwithstanding. The first is the medical examination to be performed by Dr. Choucair, a plastic surgeon retained by APS, with which APS hopes to counter findings by Dr. Roman, Hewitt's expert witness. The second is the "functional capacity evaluation and impairment rating in order to determine [Hewitt's] ability to return to work," to be performed by ErgoRehab. While APS offered to consolidate these examinations into a single event, it nonetheless requested two different types of examination, by two or more

14

individuals, and thus made two requests for relief under Rule 204.1. *See* TEX. R. CIV. P. 204.1(a)(1).

### 1. Medical examination

We turn first to the request for a medical examination. The parties do not dispute that APS's request for this examination satisfied the requirements of Rule 204.1(a)(1) that the motion be made no later than 30 days before the end of any applicable discovery period and the examination be performed by a qualified physician. *See id.* We therefore turn to the requirements of Rule 204.1(c)(1): (1) a showing of good cause and (2) establishing that Hewitt's physical condition "is in controversy." TEX. R. CIV. P. 204.1(c)(1).

We analyze whether a movant has shown "good cause" under Rule 204.1 using the factors set forth by the Supreme Court of Texas in *Coates v. Whittington*, 758 S.W.2d 749 (Tex. 1988). *See Coates*, 758 S.W.2d at 753 (analyzing compelled mental examination under predecessor rule); *see also In re H.E.B. Grocery Co.*, No. 15-0625, 2016 WL 3157533, at \*2 (Tex. May 27, 2016) (applying *Coates* to Rule 204.1 request for medical examination); *In re Transwestern Publ'g Co.*, 96 S.W.3d 501, 505 (Tex. App.—Fort Worth 2002, orig. proceeding) (applying *Coates* to Rule 204.1 request for medical examination, but noting that Rule 204.1 goes further than predecessor rule by requiring both good cause and showing that condition is "in controversy"). That is, we look to see

whether (1) "an examination is relevant to issues that are genuinely in controversy in the case," (2) the movant has shown "a reasonable nexus between the condition in controversy and the examination sought," and (3) the movant has "demonstrate[d] that it is not possible to obtain the desired information through means that are less intrusive than a compelled examination." *Coates*, 758 S.W.2d at 753; *see also H.E.B.*, 2016 WL 3157533, at *2; *In re Transwestern*, 96 S.W.3d at 505.

APS has satisfied the first factor by showing that the examination is relevant to issues genuinely in controversy. *See Coates*, 758 S.W.2d at 753. APS must show both that the examination is relevant to Hewitt's condition and that "the requested examination will produce, or is likely to lead to, *evidence* of relevance to the case." *Coates*, 758 S.W.2d at 753 (emphasis added). At the heart of Hewitt's petition are the "severe physical injuries" that he suffered, and he bases his claim for actual damages on those injuries themselves and their effects, including the past and future medical expenses associated with treatment for the injuries and a reduction in earning capacity. He identified as potential expert witnesses regarding his medical condition and treatment not only Dr. Roman, but at least six other physicians. Moreover, Hewitt does not dispute that his medical condition is in controversy, either in this proceeding or in his response to APS's motion.

16

APS has also shown that the requested examination "will produce, or is likely to lead to, evidence of relevance to the case." *See Coates*, 758 S.W.2d at 753. When one party's expert offers opinions on future medical expenses, the other party often has "no opportunity to explore and develop evidence that supports theories that contradict the theories espoused by" that expert, absent an independent medical examination. *See Ten Hagen*, 435 S.W.3d at 871. APS requests an independent medical examination to permit Dr. Choucair to "provide opinions related to [Hewitt's] injuries and anticipated future medical treatment," for the express purpose of challenging Dr. Roman's opinions. By definition, this request constitutes an attempt to produce evidence relevant to Hewitt's claims.

The second *Coates* factor is whether APS has shown "a reasonable nexus between the condition in controversy and the examination sought." *Coates*, 758 S.W.2d at 753. Again, Hewitt has not disputed that a nexus exists between Hewitt's medical condition and the medical examination requested by APS. And for the reasons discussed in connection with the first *Coates* factor, we hold that such a nexus clearly exists. Indeed, the entire purpose of the examination is to assess Hewitt's injuries and future medical needs related to those injuries.

With respect to the third *Coates* factor, whether APS has "demonstrate[d] that it is not possible to obtain the desired information through means that are less intrusive than a compelled examination," Hewitt and APS disagree sharply. *See*

17

*Coates*, 758 S.W.2d at 753 (identifying third factor in context of compelled mental examination). Hewitt argues that APS must exhaust all other avenues that might permit it to obtain the desired information, before requesting a Rule 204.1 examination. Indeed, as the Supreme Court of Texas explained in *Coates*, a party's "privacy interests require, at minimum, that [the opposing party] exhaust less intrusive means of discovery before seeking a compulsory . . . examination." *Id.* But as the court immediately clarified, "[i]f, however, a plaintiff intends to use expert medical testimony to prove his or her alleged . . . condition, that condition is placed in controversy and the defendant would have good cause for an examination." *Id.* The court thus recognized the tension between a plaintiff's privacy rights and a defendant's need to obtain evidence with which it can challenge the conclusions of the plaintiff's expert witnesses.

The means of obtaining information that are less intrusive than a compelled examination include "deposing the opposing party's doctors," "attempting to obtain copies of medical records, . . . or relying on existing expert witness reports already filed in the case." *Ten Hagen*, 435 S.W.3d at 869–70 (collecting authorities). "The adequacy of these measures must still be evaluated in light of the fair trial standard, however." *Id.* at 870. "In many cases the treating physician's notes, the medical records of the complaining party, and expert witness reports filed by other parties cannot serve these legitimate purposes." *Id.*

"In general, and particularly where the intended examination is not intrusive, invasive or unnecessarily physically uncomfortable, parties are permitted to explore matters not covered by the opposing party's examinations, make their own observations, and attempt to discover facts that may contradict the opinions of the opposing party's expert witnesses." *Id.* In such cases, "fundamental fairness dictates" that both parties' experts be permitted to conduct an examination, lest one side "be at a severe disadvantage in the 'battle of experts.'" *Laub v. Millard*, 925 S.W.2d 363, 365 (Tex. App.—Houston [1st Dist.] 1996, orig. proceeding); *Sherwood Lane Assocs. v. O'Neill*, 782 S.W.2d 942, 945 (Tex. App.—Houston [1st Dist.] 1990, orig. proceeding).

This is such a case. Dr. Roman submitted a report, of which at least four pages and multiple "diagnostic conclusions" are based exclusively upon his own examination of Hewitt, rather than on Hewitt's medical records or other sources. Under these facts, alternative information sources such as physicians' notes, medical records, and a deposition of Dr. Roman simply do not suffice as substitutes for an independent medical examination. Permitting Hewitt to introduce expert testimony based on a physical examination while denying APS the opportunity to do the same violates the fair trial standard by placing APS at too great a disadvantage in the "battle of experts." *Laub*, 925 S.W.2d at 365; *Sherwood Lane*, 782 S.W.2d at 945; *see also Ten Hagen*, 435 S.W.3d at 870.

Further, APS lacks any adequate remedy by appeal.  Without relief from the trial court's order denying APS's Rule 204.1 motion with respect to a medical examination, APS will be forced to go to trial without an opportunity to adequately defend itself, making an appeal an inadequate remedy.  *See*, *e.g.*, *Ten Hagen*, 435 S.W.3d at 864 (appeal inadequate when party is denied physical examination to which it is entitled and which it needs to contradict opposing party's expert witness); *Transwestern*, 96 S.W.3d at 508 (same holding with respect to mental examination).

We conclude that APS has shown that Hewitt's medical condition is in controversy and that good cause exists for a Rule 204.1 medical examination.  The trial court abused its discretion by denying APS's motion to compel such an examination, and APS lacks an adequate remedy by appeal.  We therefore grant the petition for writ of mandamus with respect to the request for a medical examination.

### 2. "Functional capacity evaluation and impairment rating" by ErgoRehab

APS, has not, however, met its burden with respect to the requested "functional capacity evaluation and impairment rating" by ErgoRehab.

As a threshold matter, APS has not explained—either in its Rule 204.1 motion or in its petition for writ of mandamus—what the proposed examination involves, nor has it explained why such an examination is necessary.  Rather, in the

20

mandamus petition, APS only mentions the examination and ErgoRehab one time each. And in the Rule 204.1 motion, APS makes no attempt to explain what information the examination would reveal, why that information is or might lead to relevant evidence, or why such information cannot be obtained by less intrusive means. While it characterizes the request for "functional capacity evaluation and impairment rating" as "simply a request by Defendant [for Hewitt] to submit to an exam by a healthcare provider as ordered by his treating doctor," that characterization is disputed, and APS makes no attempt to show that it has "good cause" for such a request or that the Rules of Civil Procedure allow for it.

Even assuming that the "functional capacity evaluation and impairment rating" examination is relevant to Hewitt's physical condition and might lead to relevant evidence, APS is not entitled to such an examination. Rule 204.1 provides for motions to compel a party to "submit to a physical . . . examination by a qualified physician." TEX. R. CIV. P. 204.1(a)(1). APS's motion, like its mandamus petition, is silent regarding who would perform the "functional capacity evaluation and impairment rating" examination, the nature of that examination, or whether it would be performed by a "qualified physician." For this reason, APS has failed to show that its motion satisfies the requirements of Rule 204.1. *See Coates*, 758 S.W.2d at 751 (trial court's order was invalid when rule required examination by "physician" and trial court ordered examination by psychologist);

21

*Moore v. Wood*, 809 S.W.2d 621, 622–24 (Tex. App.—Houston [1st Dist.] 1991, orig. proceeding) (granting writ of mandamus when trial court ordered "vocational rehabilitation interview and assessment of the plaintiff," as such exam was not permitted by rules allowing for examination only by doctors or psychologists).

APS has failed to demonstrate either that a "functional capacity evaluation and impairment rating" by ErgoRehab constitutes available relief under Rule of Civil Procedure 204.1 or that good cause existed for the trial court to grant such relief. We therefore deny the petition for writ of mandamus in cause number 01-15-00758-CV with respect to that examination.

## Sanctions

We now turn to APS's challenge to the trial court's sanctions order.

### A. Applicable Law

"A fundamental tenet of our legal system is that each and every trial is decided on the merits of the lawsuit being tried." *Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 13 (Tex. 2014). However, when spoliation of evidence occurs, "spoliation can deprive the factfinder of relevant evidence." *Id.* "Trial courts therefore must have wide discretion in remedying such conduct and in imposing sanctions to deter it." *Id.* "However, the imposition of a severe spoliation sanction, such as a spoliation jury instruction, can shift the focus of the case from

22

the merits of the lawsuit to the improper conduct that was allegedly committed by one of the parties during the course of the litigation process." *Id.*

"In some circumstances, a missing piece of evidence like a photograph or video can be irreplaceable." *Id.* at 17. "Testimony as to what the lost or destroyed evidence might have shown will not always restore the nonspoliating party to an approximation of its position if the evidence were available; sometimes a picture is indeed worth a thousand words." *Id.*

"[W]hether a party spoliated evidence and whether a particular remedy is appropriate are questions of law for the trial court," as opposed to a question of fact for the jury. *Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 488 (Tex. 2014) (citing *Brookshire Bros.*, 438 S.W.3d at 20). To find that evidence has been spoliated, "the trial court must make affirmative determinations as to two elements:" first, that "the party who failed to produce evidence . . . had a duty to preserve the evidence," and "[s]econd, the nonproducing party must have breached its duty to reasonably preserve material and relevant evidence." *Id.*

When evidence is spoliated, "courts have broad discretion to utilize a variety of remedies to address spoliation, including the spoliation instruction." *Brookshire Bros.*, 438 S.W.3d at 17. But "[w]hile the trial court's discretion to remedy an act of spoliation is broad, it is not limitless." *Petroleum Sols.*, 454 S.W.3d at 489. Rather, courts follow a two-part test to determine whether a particular sanction for

discovery abuse is just. *Id.* "First, a direct relationship must exist between the offensive conduct, the offender, and the sanction imposed." *Id.* "Second, a sanction must not be excessive, which means it should be no more severe than necessary to satisfy its legitimate purpose." *Id.* "This prong requires the trial court to consider the availability of lesser sanctions and, 'in all but the most exceptional cases, actually test the lesser sanctions.'" *Id.* (quoting *Cire v. Cummings*, 134 S.W.3d 835, 841 (Tex. 2004)).

A spoliation instruction informs the jury that it must presume that the missing evidence would have harmed the case of the party responsible for the unavailability of the evidence. *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 724 (Tex. 2003). The "very purpose" of the spoliation instruction is to "nudge or tilt the jury toward a finding adverse to the alleged spoliator." *Brookshire Bros.*, 438 S.W.3d at 17 (internal quotation marks omitted) (quoting *Wal–Mart Stores*, 106 S.W.3d at 724). As a result, a spoliation instruction "often ends litigation because it is too difficult a hurdle for the spoliator to overcome." *Id.* (internal quotation marks omitted) (quoting *Zubulake v. UBS Warburg L.L.C.*, 220 F.R.D. 212, 219 (S.D.N.Y. 2003)). Nonetheless, the purpose of any sanction for spoliation is "to impose an appropriate remedy so that the parties are restored to a rough approximation of what their positions would have been were the evidence available." *Id.* at 18 (citing *Wal–Mart Stores*, 106 S.W.3d at 721).

"[W]hen a trial court imposes discovery sanctions which have the effect of precluding a decision on the merits of a party's claims—such as by striking pleadings, dismissing an action, or rendering default judgment—a party's remedy by eventual appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment." *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 920 (Tex. 1991). In such a situation, a party may seek mandamus relief to correct an abuse of discretion by the trial court. *Id.*

**B.     Analysis**

To decide this petition for writ of mandamus, we must consider two questions. First, we must determine whether the evidence was spoliated. *Petroleum Sols.*, 454 S.W.3d at 488. Second, we must examine each of the sanctions imposed by the trial court and determine whether that sanction was an appropriate remedy for the conduct at issue. *Id.*

To obtain sanctions for spoliation, Hewitt first had to prove that spoliation occurred. As the Supreme Court of Texas has explained in *Petroleum Solutions, Inc. v. Head*, 454 S.W.3d 482, 488 (Tex. 2014), this requires two affirmative determinations: (1) that APS had a duty to preserve evidence and (2) that APS breached that duty. *Id.*

### 1. Duty to preserve the videotape

A person has a duty to preserve evidence "only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim." *Wal–Mart Stores*, 106 S.W.3d at 722 (citing *Nat'l Tank Co. v. Brotherton*, 851 S.W.2d 193, 204 (Tex. 1993)). A "substantial chance" of litigation "does not [mean] any particular statistical probability that litigation will occur; rather, it simply means that litigation is more than merely an abstract possibility or unwarranted fear." *Nat'l Tank Co.*, 851 S.W.2d at 204 (citation and internal quotation marks omitted). When a reasonable person would conclude from the severity of an accident or other circumstances that a substantial chance of litigation exists, a duty to preserve evidence arises. *Wal–Mart Stores*, 106 S.W.3d at 722 (citing *Nat'l Tank Co.*, 851 S.W.2d at 204).

In his motion for sanctions, Hewitt argued that APS's duty to preserve the video of the incident arose from a variety of incidents and circumstances: (1) the very nature of Hewitt's injuries; (2) Hewitt's statements that he might hire counsel, while he was still in the hospital; (3) Baker's actions in showing the video to Hewitt and Hewitt's girlfriend; (4) Hewitt's statements threatening litigation in March 2014; (5) the commencement of litigation later that month; (6) service of the suit in June 2014; and (7) the preservation letter that Hewitt's counsel sent to

APS five days later. APS argued, in response, that Hewitt did not notify APS that it should preserve the video—and thus APS had no reason to believe that it should do so—until counsel sent the preservation letter in July 2014. APS argues that Hewitt's statements about possibly hiring an attorney—which Baker testified were spoken "fairly early on"—did not put APS on notice because there is no evidence tying those statements to any particular time or demonstrating that the video still existed at that time.[5]

Baker's testimony alone supports a finding that APS had a duty to preserve the video from the moment of Hewitt's injuries. Baker testified that he knew, immediately after the accident, that "it was an emergency situation" and that Hewitt had suffered burns to at least three limbs and his face, burns severe enough to cause skin to separate from Hewitt's body within minutes of the explosion. Baker also visited Hewitt at least twice in the hospital, where he not only saw Hewitt's condition, but also showed Hewitt the video in question. He also testified

---

[5] APS also contends that Hewitt told Baker that he intended to continue taking classes for which APS was paying; that he "felt fine other than his left arm;" that "there was [nothing] else that [APS] need[ed] to do" for Hewitt; and that, when he returned to work, he would repay to APS bail money that APS had paid on his behalf and that had been returned to Hewitt by mistake. According to APS, these statements indicate that Hewitt was not considering litigation until March 2014, the first time that he affirmatively stated that he had found an attorney, rather than that he was merely considering hiring one. But none of the statements identified by APS bear on whether Hewitt actually intended to file suit against APS for his injuries. We reject APS's contention that these statements, taken in context, would lead a reasonable person to conclude that APS did not face a substantial chance of litigation.

that, "[a]t the first look" at the video he agreed with Hewitt that Guzman's action in opening a valve caused the explosion and fire that injured Hewitt. Baker went so far as to terminate Guzman, and one of the reasons in the termination report was that Guzman had injured a fellow employee, which Baker acknowledges was a reference to Hewitt. While Baker insists that he no longer believes that Guzman's actions caused Hewitt's injuries, he testified that he "definitely" thought they did when he visited Hewitt in the hospital, and, "At the time [of Guzman's termination] that's what we believed." In the aftermath of the incident, Baker tried to determine the cause of the explosion and fire. In particular, he investigated whether the use of a 40-pound bucket, as opposed to a smaller bucket, contributed to the incident. To answer that question, APS employees "reviewed . . . the tapes three weeks before this accident," but APS determined that its employees were using 40-pound buckets for at least those three weeks.

Taken together, Baker's own testimony conclusively demonstrates that he (1) saw an employee under his supervision suffering from severe injuries sustained on the job; (2) considered the situation to be an "emergency;" (3) drove Hewitt to a hospital himself; (4) knew that video existed of the incident causing the injury; (5) watched the video himself the same day; (6) showed the video to Hewitt on two occasions and Hewitt's girlfriend once, at Hewitt's request; (7) initially believed that the video showed that Guzman, an APS employee, caused the accident;

28

(8) terminated Guzman's employment based in part on that belief; and (9) watched not only the video of the incident but also three weeks' worth of preceding videos to investigate the causes of the incident. The trial court reasonably could have concluded that a reasonable person, given the severity of the accident and other circumstances identified by Baker, (1) would believe APS faced a "substantial chance" of litigation over the incident, "more than merely an abstract possibility or unwarranted fear;" and (2) would appreciate the central importance of the video in understanding what had happened. *See Nat'l Tank Co.*, 851 S.W.2d at 204 (citation and internal quotation marks omitted). Under these circumstances, the trial court acted within its discretion in concluding that APS had a duty to preserve the videotape from the date of the incident.

### 2. Breach of the duty to preserve

APS does not dispute that the video was destroyed by the automatic operations of its security system. Because we have already held that the trial court did not abuse its discretion in concluding that APS had a duty to preserve the video, APS was required to take reasonable steps to preserve the video. On this record, APS has not demonstrated that it took such steps. Before we can review the trial court's imposition of sanctions, however, we must determine whether the spoliation was intentional or merely negligent, as well as whether and to what extent Hewitt was prejudiced by its destruction.

A party's destruction of or failure to produce evidence can support sanctions for spoliation regardless of whether the spoliation was negligent or intentional. *Brookshire Bros.*, 438 S.W.3d at 19–20. Merely negligent spoliation will not support a finding that evidence is relevant and harmful to the spoliating party without "some proof about what the destroyed evidence would show." *Brookshire Bros.*, 438 S.W.3d at 22 (quoting *Trevino v. Ortega*, 969 S.W.2d 950, 958 (Tex. 1998)).

The supreme court's opinion in *Brookshire Brothers v. Aldridge*, 438 S.W.3d 9 (Tex. 2014) is instructive here. In that case, the court considered a slip-and-fall case, in which the plaintiff did not tell store employees at the time of his fall that he had been injured, and the store did not complete an accident report. *Id.* at 15. The plaintiff later went to an emergency room because of pain, and returned to the store a few days later to report his injuries. *Id.* The company that owned the store where the plaintiff was injured voluntarily preserved eight minutes of surveillance video footage, covering the time from just before the plaintiff entered the store until shortly after he fell. *Id.* The plaintiff requested a copy of the video less than two weeks after his fall, but the store refused to release it because it had only one copy. *Id.* The system automatically recorded over the remainder of the video within approximately 30 days of the fall. *Id.*

Nearly a year later, after the company ceased paying the plaintiff's medical expenses and decided to deny coverage, the plaintiff's attorney requested two-and-a-half hours of additional footage, but the video had been recorded over months earlier. *Id.* Only then did the plaintiff file suit. *Id.* The plaintiff requested a spoliation instruction. *Id.* at 16. The trial court allowed the jury to hear evidence regarding whether the defendant had spoliated the video, submitted a spoliation instruction to the jury, and allowed the jury to decide, during its deliberations on the merits of the case, whether spoliation occurred. *Id.*

The court held that a spoliation analysis requires "a two-step judicial process," by which the trial court must first "determine, as a matter of law, whether a party spoliated evidence," and then, "if spoliation occurred, assess an appropriate remedy." *Id.* at 14. The court further held that a spoliation instruction was warranted only when a party intentionally, rather than negligently, spoliated evidence. *Id.* at 23. But the court expressly stated that "intentional" spoliation "includes the concept of 'willful blindness,' which encompasses the scenario in which a party does not directly destroy evidence known to be relevant and discoverable, but nonetheless allows for its destruction." *Id.* at 24–25. The court also identified a "narrow exception" to the intentionality requirement, explaining that a spoliation instruction for negligent spoliation might be appropriate "if the act of spoliation, although merely negligent, so prejudices the nonspoliating party that

31

it is irreparably deprived of having any meaningful ability to present a claim or defense." *Id.* at 25–26.

Under the facts of *Brookshire Brothers*, the court concluded that there was no evidence that the company "saved the amount of footage that it did in a purposeful effort to conceal relevant evidence;" rather, it "preserved exactly what it was asked to preserve—footage of the fall." *Id.* at 28. It emphasized that there was no evidence that any company "employee viewed any additional footage from that day other than the eight preserved minutes," and stressed, "Had Brookshire Brothers allowed *all* footage of the incident to be destroyed, the outcome might be different." *Id.* The court also noted that the plaintiff had sufficient evidence available to prove the elements of his claim, including video depicting the fall itself, the area around the fall, and the actions of various store employees, as well as the store's incident report confirming that the plaintiff had slipped on grease that leaked onto the floor. *Id.* The court concluded that the trial court abused its discretion both in permitting the jury to consider evidence of spoliation and in submitting a spoliation instruction because there was no evidence that the defendant intentionally destroyed evidence or that the plaintiff "was deprived of any meaningful ability to present his claim to the jury at trial." *Id.* at 30.

By contrast, APS viewed all available video up to and through the incident but made no effort to save any video at all, despite the obvious severity of Hewitt's

32

injuries, Hewitt's requests to see the video, and the fact that APS itself found the video helpful in reconstructing the incident and conducting "experiments" by "repeating the steps that happened that day," steps that Baker knew only from watching the video. Instead of preserving the video, APS made use of it, then did not endeavor to keep it from being destroyed by an automated process. Under the circumstances of this case, the trial court could reasonably have concluded, within its sound discretion, that APS's actions constitute at least willful blindness to the destruction of evidence. Such destruction qualifies as intentional spoliation. *See id.* at 24–25.

Even if APS's spoliation qualifies as merely negligent and not intentional, it nonetheless deprived Hewitt of a meaningful opportunity to present his claims. The trial court had before it Baker's testimony, including "some proof about what the destroyed evidence would show," as required for a spoliation instruction based on negligent spoliation. *Brookshire Bros.*, 438 S.W.3d at 22. Because APS has availed itself of the video in defending the case while depriving Hewitt of the right on a central element of the case—causation—we hold that this case meets the "narrow exception" allowing for a spoliation instruction for negligent spoliation. *Id.* at 25–26.

### 3. Prejudice

Before a trial court can assess sanctions for spoliation, it must consider the prejudice to the other party. *Id.* at 22. "Prejudice is evaluated based on the spoliated evidence's relevancy to key issues in the case, whether the evidence would have been harmful to the spoliating party's case (or, conversely, helpful to the nonspoliating party's case), and whether the spoliated evidence was cumulative of other competent evidence that may be used in its stead." *Petroleum Sols.*, 454 S.W.3d at 489.

Applying the *Petroleum Solutions* factors, the spoliation prejudiced Hewitt. The video was highly relevant to key issues in the case, in particular when Guzman acted, when and how the fire and explosion started, whether each actor followed standard procedures at the facility, and other issues. The video was damaging to APS's case and helpful to Hewitt's, given that even Baker initially believed that the video showed that Guzman caused the explosion. And the evidence was unique, rather than cumulative of other evidence. Although Hewitt can provide his own testimony, examine Baker, impeach Baker with deposition testimony, and rely upon documents produced by APS, he cannot show a jury the video that provides the best evidence of the exact sequence of events on the fateful day. Unlike Baker, who conducted—and, apparently, intends to testify about—"experiments" based on the events in the video, Hewitt has no evidence other than his own testimony

regarding the sequence of events. Hewitt has testified, "[T]here's no way I [could] see through the reactor or see behind the reactor where Donny was. The only way I knew that he was back there is after viewing the video of the accident and I saw what he did . . . ."

### 4. Spoliation instruction

The trial court has broad but limited discretion to impose appropriate sanctions to remedy spoliation. *Petroleum Sols.*, 454 S.W.3d at 489; *Brookshire Bros.*, 438 S.W.3d at 17. To determine whether the trial court abused that discretion, we apply the two-part test set out in *Brookshire Brothers* and *Petroleum Solutions*.

First, "a direct relationship must exist between the offensive conduct, the offender, and the sanction imposed." *Petroleum Sols.*, 454 S.W.3d at 489; *Brookshire Bros.*, 438 S.W.3d at 21. "To meet this requirement, a sanction must be directed against the wrongful conduct and toward remedying the prejudice suffered by the innocent party." *Petroleum Sols.*, 454 S.W.3d at 489; *Brookshire Bros.*, 438 S.W.3d at 21. Here, a direct relationship exists between (1) the wrongful conduct of spoliation; (2) APS, the spoliating party; and (3) the trial court's attempt to remedy the prejudice suffered by Hewitt by granting a spoliation instruction. The first requirement is therefore satisfied.

Second, the trial court must not impose an "excessive" sanction, one that is "more severe than necessary to satisfy its legitimate purpose." *Petroleum Sols.*, 454 S.W.3d at 489. "This prong requires the trial court to consider the availability of lesser sanctions and, 'in all but the most exceptional cases, actually test the lesser sanctions.'" *Id.* (quoting *Cire*, 134 S.W.3d at 841). The purpose of the sanction, however, must be "to impose an appropriate remedy so that the parties are restored to a rough approximation of what their positions would have been were the evidence available." *Brookshire Bros.*, 438 S.W.3d at 18 (citing *Wal–Mart Stores*, 106 S.W.3d at 721). Given the unique nature of the video and the absence of any evidence that can satisfy the same function of showing the sequence and timing of the incident in question, no lesser sanctions could legitimately remedy the prejudice to Hewitt. The trial court could not meaningfully test any lesser sanctions, as the conduct to be remedied is already complete and the resulting damage done.

Under the facts of this case, we hold that APS has failed to demonstrate that the trial court abused its discretion by granting Hewitt's motion for a spoliation instruction.

### 5. Striking pleadings

To strike a party's pleadings is to impose a remedy "akin to death penalty sanctions," so called because they are the most severe sanctions available under the

Texas Rules of Civil Procedure. *Petroleum Sols.*, 454 S.W.3d at 489; *see* TEX. R. CIV. P. 215.2(b)(5) (trial court may make "an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing with or without prejudice the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party"); *Hansen v. Gilbert*, No. 01-03-00863-CV, 2005 WL 327158, at \*2 (Tex. App.—Houston [1st Dist.] Feb. 10, 2005, no pet.). Striking a party's pleadings "foreclose[s] (or at least severely impede[s]) a party from presenting the merits of its claims or defenses." *Petroleum Sols.*, 454 S.W.3d at 490; *see also Primo v. Rothenberg*, 14-13-00794-CV, 2015 WL 3799763, at \*24 (Tex. App.—Houston [14th Dist.] June 18, 2015, pet. struck).

We again apply the two-part test set out in *Brookshire Brothers* and *Petroleum Solutions* to determine whether the trial court abused its discretion by striking APS's pleadings. We hold that this sanction was excessive and therefore fails to meet the second part of the test.

Under *Petroleum Solutions*, a sanction must not be "more severe than necessary to satisfy its legitimate purpose." *Petroleum Sols.*, 454 S.W.3d at 489. As the court explained in *Petroleum Solutions*, the trial court must "consider the availability of lesser sanctions and, 'in all but the most exceptional cases, actually test the lesser sanctions.'" *Id.* (quoting *Cire*, 134 S.W.3d at 841). Further, the

purpose of the sanction must be "to impose an appropriate remedy so that the parties are restored to a rough approximation of what their positions would have been were the evidence available." *Brookshire Bros.*, 438 S.W.3d at 18 (citing *Wal–Mart Stores*, 106 S.W.3d at 721).

The trial court did not explain why it was necessary to sanction APS both by granting a spoliation instruction and striking APS's pleadings. Striking APS's pleadings goes beyond the purpose of restoring the parties to "a rough approximation of what their positions would have been were the evidence available." *See Brookshire Bros.*, 438 S.W.3d at 18. That purpose was accomplished by the granting of a spoliation instruction, which requires the jury to presume that the video was harmful to APS's defense. *See Wal–Mart Stores*, 106 S.W.3d at 724. By both giving a spoliation instruction and striking APS's pleadings, the trial court did more than merely level the playing field. The spoliation instruction leveled the field, but the trial court's further action in striking the pleadings effectively declared the game forfeited.

Texas courts must exercise caution in imposing death penalty or analogous sanctions. Indeed, such sanctions are appropriate only as an "exception rather than the rule." *TransAmerican Nat. Gas*, 811 S.W.2d at 919. For example, a pattern of abuse can support death penalty sanctions. In *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238 (Tex. 1985), the Supreme Court of Texas has affirmed a

sanction striking a defendant's answer and rendering judgment for the plaintiff when the defendant and his employees failed to appear for their depositions on three separate occasions without explanation. 701 S.W.2d 238, 241–42 (Tex. 1985) (cited in *TransAmerican Nat. Gas*, 811 S.W.2d at 919). But the court overturned a similar sanction when the president of a defendant corporation failed to appear for a deposition on a single occasion, it was unclear whether the corporation or counsel was at fault, and nothing in the record indicated that the trial court "considered imposition of lesser sanctions or that such sanctions would not have been effective." *TransAmerican Nat. Gas*, 811 S.W.2d at 918. The court explained that such a record "does not show the same pattern of abuse" as the repeated failures to appear in *Downer*. *Id.* at 919.

Similarly, direct violation of court orders can support death penalty sanctions. Accordingly, the Supreme Court of Texas sustained sanctions when a legal-malpractice plaintiff burned 70 to 100 "secret audiotape recordings" between herself and the defendant lawyer and "laughed with her friends about being a habitual liar" *Cire*, 134 S.W.3d at 837. The plaintiff had testified during pretrial discovery that the tapes existed, yet refused to produce them despite discovery requests for their production and an order compelling production. *Id.* When the defendant moved for sanctions, the plaintiff testified at the sanctions hearing that she had possession of the tapes, intended to use them against the defendant, and

39

had not destroyed them. *Id.* Other evidence, however, showed that she had destroyed them intentionally. *Id.* The trial court found that the plaintiff "'flagrantly violated' four discovery orders . . . refus[ed] to answer deposition questions, used forged documents 'to gain an advantage with the court,' gave conflicting testimony under oath, and 'deliberately destroyed and/or concealed material evidence' [the audiotapes] that would 'show [her] claims had no merit.'" *Id.* at 838. The trial court therefore struck the plaintiff's pleadings. *Id.* The court of appeals reversed, but a unanimous supreme court reversed the court of appeals and upheld the sanctions. *Id.* at 845. Likewise, this Court has affirmed death penalty sanctions when a plaintiff fabricated an audio tape to support her workplace-sexual-harassment claims. *Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 235 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (en banc) (noting that fabrication of evidence constitutes third-degree felony).

No such egregious circumstances are present here. The video was destroyed before Hewitt filed suit, and thus was not the subject of any discovery requests or court orders before its destruction. The record contains no indication that APS violated court orders, destroyed evidence on multiple occasions, fabricated evidence, or otherwise engaged in any pattern of abuse or other conduct that might merit placing APS in a worse position than that from which it began.

We hold that the trial court erred in ordering APS's pleadings stricken because that sanction was excessive under the facts of this case. A party whose pleadings are stricken has no adequate remedy by appeal unless the trial court simultaneously renders a final, appealable judgment. *TransAmerican Nat. Gas*, 811 S.W.2d at 920. The trial court did not do so here, and APS is therefore entitled to mandamus relief.

## Conclusion

We conditionally grant each petition for writ of mandamus in part and deny each in part.

In cause number 01-15-00758-CV, we conditionally grant the petition with respect to APS's requested medical examination by Dr. Choucair. We order the trial court to rescind its July 17, 2015 order denying APS's Rule 204.1 motion and make an order compelling Hewitt to submit to a medical examination by Dr. Choucair. With respect to the examination by ErgoRehab, we deny the petition.

In cause number 01-15-01102-CV, we conditionally grant the petition with respect to the portion of the trial court's order striking APS's pleadings. We order the trial court to rescind that portion of its October 12, 2015 order striking the pleadings. With respect to the spoliation instruction, we deny the petition.

We are confident that the trial court will act in accordance with this opinion, and our writs will issue only in the event that it fails to do so.

We lift the stay of the trial imposed by our order of September 4, 2015.


Laura Carter Higley
Justice

Panel consists of Justices Higley, Bland, and Massengale.